IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GARTOR KIKI BROWN, | : | |
|           Plaintiff, | : | CIVIL ACTION |
| | : | No. 19-1971 |
| v. | : | |
| | : | |
| GEO GROUP, INC., et al. | : | |
|           Defendants. | : | |
| | : | |
| | : | |

**McHUGH, J.**                                                           **July 31, 2020**

## MEMORANDUM

This is a prisoner civil rights case. Gartor Brown alleges that he was subjected to excessive force and retaliation, and he also alleges that he received inadequate medical treatment for injuries he sustained at the hands of corrections officers.[1] Seven of the twelve defendants named in the action now move for dismissal[2], asserting that Brown has failed to state a claim upon which relief may be granted. For the reasons that follow, the motion will be granted in its entirety.

**I.    Relevant Background**

The crux of Brown's allegations is that, in retaliation for filing a grievance, members of prison staff subjected Brown to excessive force, which caused injuries, and then denied him treatment for those injuries after the fact. The allegations center,

---

[1] It is the third case of his in which the Court has ruled on a dispositive motion in the past several months.

[2] The remaining defendants have not been served.

specifically, on two purportedly violent interactions Brown claims to have had with corrections officers and treatment he claims was denied in May 2017.

Brown alleges that the trouble first started on May 14, 2017, when C/O Bagwell and another official entered his cell to perform a strip search and used excessive force to accomplish that task. (Compl. ¶¶ 21-22.) During the incident, Brown says the pair slammed his head into the wall repeatedly, hit him in the ribs, and wrapped a TV cord around his neck. (*Id.* ¶ 26.) Brown claims the attack was the physical culmination of earlier threats and harassment to which he was subjected in retaliation for his having filed a grievance against their colleagues. (*Id.* ¶ 23.) The attack purportedly resulted in injuries to Brown's head, neck, back and ribs. (*Id.* ¶ 26.)

Brown then avers that he sought treatment from medical personnel for those injuries on May 15, 2017, but that the treatment was denied. Specifically, he alleges that Dr. Phillips and Nurses Cynthia and Tuttle performed what he believed was an inadequate examination of his injuries, and he claims that Phillips told one of the other defendants "he likes to litigate, he gets nothing." (*Id.* ¶ 27.) Brown was seen the following day by Nurse Bouvier, who Brown claims admitted that Phillips instructed her not to treat him but nevertheless proceeded to conduct an examination. (*Id.* ¶ 28.) As with the previous encounter, Brown claims that Bouvier's examination was inadequate and failed to note injuries he suffered two days prior. (*Id.*)

On May 17, 2017, the alleged physical abuse and lack of treatment described above pushed Brown to stage a protest in the recreation area of his cell block. Although not entirely clear from the Complaint, Brown appears to plead that he climbed to the top

of a 40-foot tall fenced cage on which he alleges prison officials constructed a platform to accommodate frequent prisoner protests. (*Id*. ¶¶ 29-30.) Brown climbed through a hole in the top of the cage, and once on the platform, demanded to see the Warden to complain about the purported lack of treatment. (*Id*.) Brown avers that he disclaimed any intent to harm himself, stating that his purpose for the act was "nonviolent protest pertaining to his mistreatment and deprivation of medical treatment." (*Id*. ¶ 31.) The protest had the desired effect of drawing out a Deputy Warden to whom Brown aired his grievances, after which Brown says he agreed to come down from the cage. (*Id*.)

According to the Complaint, Brown was met with excessive force from officers tasked with bringing him down from the cage.[3] Brown claims that as he prepared to descend along the outside of the cage, C/O Zglszweksi, who was positioned on a ladder nearby, grabbed and pulled on him. (*Id*. ¶ 32). Brown avers that he told Zglszewski that he was afraid he might fall, asked Zglszewski to stop touching him, and ostensibly offered to go back through the hole he used to climb on top. (*Id*.) At that point, C/O Campagna is alleged to have hit him with a mace can, and Lieutenant Moore is alleged to have first hit him and then pulled him down by his hair. (*Id*.) When Brown still did not release his grip on the cage, Campagna allegedly maced him and he was pushed by one or more of the defendants, causing him to fall. (*Id*.)

Brown says the fall knocked him unconscious for "no less than 5 minutes." (*Id*. ¶ 34.) His next memory afterward was of Davis, Campagna, Laughlin, and Zglszewski

---

[3] Brown's allegations are inconsistent as to how far off the ground he was when the interaction began, but it seems most plausible that he was approximately 20 feet up. (*See* Compl. ¶ 32.)

using force to cut off his clothing and place him in an "anti-suicide smock" as well as being hit in the head "to comply." (*Id.* ¶ 38.) Brown says that after being secured, he was taken to a special cell and left there without medical treatment, though he does not specify for how long. (*Id.* ¶ 39.)

Brown next alleges that "records [show he] was evaluated by Nurse Cassidy on [May 17, 2017] after the fall." (*Id.* ¶ 35.) According to Brown, Cassidy determined he suffered no injuries and she, like her colleagues, was instructed by Phillips not to provide treatment. (*Id.* ¶¶ 36-37.) Four days later, Brown claims he again presented to the medical team to inform them about hitting his head in the fall and also to complain of injuries to his head, neck, shoulder, ribs, and heel along with slow gait and numbness extending down the right side of his body. (*Id.* ¶ 39.) Brown claims that he received no medication during this encounter and that his "injuries were ignored by defendants." (*Id.* ¶ 40.)

Based on these allegations, Brown now asserts a series of claims against the facility in which he was incarcerated at the time, as well as several individuals who worked there. Though the allegations of the Complaint are somewhat hard to follow, Brown appears to assert claims under 42 U.S.C. § 1983 for excessive force, inadequate medical treatment, retaliation, and municipal liability. The moving defendants who seek dismissal here comprise seven of the twelve parties against whom Brown has filed claims in this matter.

## II.     Standard of Review

In this Circuit, motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  Because Plaintiff is proceeding *pro se*, his pleadings must be liberally construed.  *Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 265 (3d Cir. 2011).

## III.    Discussion

### A. Preliminary Considerations

Before turning to the merits of Defendants' Motion, I begin with two threshold matters that bear on my analysis.  First, the parties do not specify whether Mr. Brown was a pretrial detainee or sentenced prisoner at the time of the incidents in question.  But Brown's status affects my determination of what standards apply to some of his claims.  Based on a review of the state court dockets, it appears Brown became a sentenced prisoner as of April 4, 2017.[4]  This has practical consequences because pretrial detainees are entitled to "greater constitutional protection than that provided by the Eighth Amendment," *Hubbard v. Taylor*, 399 F.3d 150, 167 n.23 (3d Cir. 2005), while claims by sentenced prisoners are evaluated under the Eighth Amendment, which bars cruel and unusual punishment, *id*. at 164 (quoting *Graham v. Connor*, 490 U.S. 386, 392 (1989)).  I

---

[4] *See* Court Summary available at https://ujsportal.pacourts.us/DocketSheets/CourtSummaryReport.ashx?docketNumber=CP-23-CR-0002127-2016&dnh=ox6zCY2MlhbhwSeRRDOSZA%3d%3d (last accessed July 17, 2020).  The Court may take judicial notice of a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b); *see also United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 139 (E.D. Pa. 2012) ("On a motion to dismiss, courts take judicial notice of documents which are matters of public record.") (citation omitted).

conclude that the applicable Eighth Amendment standards govern his excessive force and inadequate medical treatment claims and will analyze them accordingly.

Defendants further contend that Brown's Complaint should be dismissed because the Complaint indicates he has filed a previous lawsuit concerning the events here. (Defs.' Mot. to Dismiss, at 15, ECF 10.)  My review of the docket reveals no such claims, although Brown has previously sued some of the same defendants.  Defendants' contention on this point is therefore rejected, and I will proceed to the merits of Brown's claims.

### B. Brown fails to state a claim for excessive force against the moving Defendants.

In this Circuit, "the pivotal inquiry in reviewing an inmate's § 1983 claim for excessive force is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002) (citing *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000)).  To satisfy that inquiry, District Courts must consider five factors:  "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of the forceful response."  *Id*. at 649 (quoting *Brooks*, 204 F.3d at 106).  "The objective component of the excessive force inquiry is met when 'the inmate's injury was more than *de minimis*.'"  *Ricks v.*

*Shover*, 891 F.3d 468, 479-80 (3d Cir. 2018) (quoting *Fuentes v. Wagner*, 206 F.3d 335, 345 (3d Cir. 2000)).

The analysis required of Brown's claims for excessive force differs as to each of the incidents he alleges in the Complaint, so I will discuss them in turn.

*1. The strip search in Brown's cell*

Brown alleges that during a strip search performed in his cell, C/O Bagwell and an unnamed officer slammed his head into the wall repeatedly, hit him in the ribs, and wrapped a TV cord around his neck. (Compl. ¶ 26.) The moving Defendants argue that Brown fails to state a claim against them related to the strip search because Brown's allegations center on Bagwell and another unnamed officer, neither of whom are one of the defendants moving for dismissal here. (ECF 10, at 10.) I agree.

The Court of Appeals has stressed that "a defendant's § 1983 liability must be predicated on his direct and personal involvement in the alleged violation." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 289 (3d Cir. 2018). Thus, a district court evaluating a § 1983 claim must "eschew any theory of liability in which defendants played no affirmative part in depriving anyone of any constitutional rights—including theories of vicarious or *respondeat superior* liability." *Id.* at 290 (cleaned up). To prevail on a § 1983 claim, a plaintiff must "plead that each Government-official defendant, *through the official's own individual actions*, has violated the Constitution." *Id.* at 290 (cleaned up) (emphasis in original).

As the moving Defendants point out, Brown's Complaint alleges that Bagwell and another officer performed the strip search during which he claims to have been physically

assaulted. Because Brown alleges no facts that point to the involvement of any of the moving Defendants in that incident, they are entitled to dismissal.

  2. *Brown's protest in the recreation yard*

Brown also alleges that he was subjected to excessive force after climbing atop a fenced cage in the recreation area of his cell block. Defendants stress that Brown does not state a claim for excessive force related to this incident because officers used the force necessary to secure Brown's compliance after he created a disturbance in the area. (ECF 10, at 5-6.) Once again, I agree.

When analyzing excessive force claims in the context of a prison disturbance, the Third Circuit has recognized that corrections officers may use reasonable force against an inmate to restore or preserve order. *See Giles v. Kearney*, 571 F.3d 318, 327 (3d Cir. 2009). The determination of "whether force was applied in a good faith effort to restore discipline turns in part on the extent of the threat as reasonably perceived by the officers on the basis of facts known to them." *Id*. at 328. And the Third Circuit has affirmed dismissal of claims where officers merely overreacted to an emergency situation, rather than engage in the "malicious, sadistic behavior" necessary to establish a claim of excessive force. *Fuentes v. Wagner*, 206 F.3d 335, 346 (3d Cir. 2000).

As the Third Circuit requires, I look to the factors set forth in *Smith* to determine whether the officers here used force as part of "a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 293 F.3d at 649. Applying those factors, I conclude that the former is true because the facts alleged in Brown's

Complaint demonstrate that Brown created a disturbance and that officials acted within reasonable limits to subdue him after he did so.

Brown affirmatively pleads that he created the disturbance for the purpose of drawing out someone in prison leadership to whom he could air his grievances, and the disturbance had precisely that effect: it gave Brown the opportunity to speak with a Deputy Warden. But Brown's disturbance also necessitated a response because he endangered his own safety, and given the nature of his conduct, that response also put correctional officers at risk.

The risk to Brown continued even after the first part of the incident ended when Brown spoke with a Deputy Warden. Regardless of whether the height was 20 feet or 40 feet, Brown was clearly some meaningful distance off the ground. By way of reference, the Occupational Safety & Health Administration (OSHA) recognizes a risk of injury at heights of just four feet.[5] Under the circumstances, the responsible officers were not obligated to accept his representations that he would not harm himself and they were not required to endorse the method or route by which he proposed to come down. Nor, for that matter, did they have to place themselves at unnecessary risk by prolonging the incident.

Even assuming officials used the level of force Brown alleges as events unfolded, their intervention does not rise to the level of malicious or sadistic. He was not shot, tased, or repeatedly beaten. On the contrary, the circumstances confronting prison

---

[5] United States Department of Labor, Occupational Safety and Health Administration (OSHA), Safety and Health Topics, *Fall Protection*, https://www.osha.gov/SLTC/fallprotection/, (last visited July 27, 2020).

officials here were precisely the kind that make courts reluctant to second-guess an officer's decisions when acting to restore order.

Furthermore, even crediting Brown's allegation that he told the Deputy Warden he was not a harm to himself, there are no facts that indicate the officers who restrained him were privy to that conversation.  Their actions would still be justifiable if the facts showed otherwise, because Brown's ascent to the platform demonstrated that he posed a potential danger to himself, and the officers' need to ascend and secure him entailed risk on their part.  Moreover, Brown's alleged injuries, while regrettable, are a natural consequence of putting himself in a position that required corrections officers to exercise their discretion to intervene using some level of force.  Brown does not have a constitutional right to negotiate the terms under which he will come into compliance.

Because the Complaint fails to establish the use of excessive force as Brown was subdued coming down, I will dismiss the claim as to this incident in its entirety.

### 3. *The anti-suicide smock*

Brown finally urges that after corrections officers got him down from the fence, they subjected him to excessive force when placing him in an anti-suicide smock.  I note before going further that the mere fact of the officers placing him in the anti-suicide smock lends further credence to the notion that the officers interpreted Brown's actions at the time as indicative of a dangerous and unstable situation requiring physical intervention. Defendants stress that the claim as to this incident should be dismissed for two reasons:  (1) Brown has failed to specify which officers were involved, and (2) he does not allege in what way the officers used excessive force to get him into the smock.  I

disagree with Defendants' first contention because Brown specifically alleges that Davis, Campagna, Laughlin, and Zglszewski used force to cut off his clothing and place him in the smock.  (Compl. ¶ 38.)  But Defendants' second point lands on solid ground:  Brown does not allege facts that point to any specific actions by the officers that constituted excessive force.  He ascended to a dangerous height and created a disturbance in defiance of prison regulations.  Securing him in a manner that would prevent him from repeating that conduct cannot be deemed excessive force under the facts he has pleaded.

In sum, Brown's excessive force claims will be dismissed in their entirety as to the climbing incident and the attempt to fit him with an anti-suicide smock and dismissed in connection with the alleged strip search as to the moving Defendants only.

### C. Brown fails to state a claim for inadequate medical treatment.

Brown alleges that members of the medical staff were deliberately indifferent to his needs, citing as evidence Dr. Phillips's alleged instruction to members of the staff not to care for him and purportedly receiving inadequate medical treatment for his injuries.  I disagree.

Under the Eighth Amendment, prison officials are required to provide inmates with adequate medical care.  *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976).  But an inmate's "mere disagreement as to the proper medical treatment" will not "support a claim of an Eighth Amendment violation."  *Monmouth Cty. Corr. Inst. v. Lanzaro*, 834 F.2d 326, 346 (3d. Cir. 1987).  Rather, officials "violate an inmate's Eighth Amendment rights when they are deliberately indifferent to an inmate's serious medical need." *Dooley v. Wetzel*, 957 F.3d 366, 375 (3d Cir. 2020) (citing *Estelle*, 429 U.S. at 106

(1976)).  An inmate's medical need is serious "where failure to treat can be expected to lead to substantial and unnecessary suffering, and a doctor has diagnosed the condition, or the need for treatment would be obvious to a lay person."  *Id*. (cleaned up).  And a prison official is "deliberately indifferent to [that need] when they are actually aware of a substantial risk of serious harm and disregard that risk."  *Id*. (cleaned up).

I conclude that the allegations of the Complaint are insufficient to support an Eighth Amendment violation for denial of medical treatment.  If true, Dr. Phillips's purported instruction not to treat Brown would qualify as deliberate indifference.  But no denial of medical care followed.  Brown pleads that despite allegedly giving the instruction, Phillips himself performed an examination.  The Complaint further avers that Brown received an evaluation by staff members during each visit to the medical facility even though he did not receive the diagnosis or treatment he thought was appropriate.  And as to the final visit, the crux of Brown's issue with the treatment seems to be that he was not provided with medication when he thought he should be.

These allegations represent Brown's "mere disagreement" with the medical staff's evaluation and resultant treatment of his injuries, *Lanzaro*, 834 F.2d 346, rather than a wholesale deprivation of medical care.  Accordingly, I conclude that Brown fails to establish an Eighth Amendment violation due to inadequate medical treatment, and the claims will be dismissed in their entirety.

### D.  Brown fails to state a municipal liability claim.

Brown advances a number of theories of municipal liability against GEO Group, all of which ultimately fail.

Municipal defendants may not be held liable for constitutional violations under *Monell v. Dept. of Soc. Servs*, 436 U.S. 658, 694 (1978), on a theory of *respondeat superior*. *Brown v. City of Pittsburgh*, 586 F.3d 263, 292 (3d Cir. 2009). Plaintiffs seeking to impose that liability must allege that the defendant had a policy or custom fairly attributable to the defendant that was responsible for causing any injuries that resulted. *Id*. But "proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing . . . municipal policy, which policy can be attributed to a municipal policymaker." *Id*. (cleaned up).

Here, aside from conclusory allegations, Brown provides no facts that point to a GEO Group policy or custom that led to the injuries he claims to have suffered. Rather he focuses his allegations on the actions of specific members of the staff at the facility in which he was incarcerated.

Brown's claims against GEO Group will therefore be dismissed.

### E. Dismissal of these claims will be with prejudice

Ordinarily, dismissal at this stage comes with leave to amend. In this instance, as to these dismissed claims, leave will not be granted. Mr. Brown is an experienced and prolific *pro se* litigant. He has set forth the facts in sufficient detail to weigh the legal validity of his claims. In other cases, he has resorted to repeated amendments and significantly altered his versions of the facts in an attempt to secure a strategic advantage. *See, e.g.*, *Brown v. Upper Darby Police Dep't*, 2020 WL 733108, at *6-7 (E.D. Pa. Feb. 13, 2020). Denial of leave to amend may be premised on "bad faith or dilatory motives,

truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment." *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993). The Court's experience with Mr. Brown calls into question his good faith, particularly in light of his previous use of the court system in a manner that appears to serve purposes other than vindication of his constitutional rights. Leave to amend is therefore not warranted.

**IV.    Conclusion**

For the reasons set forth above, Defendants' Motion will be **GRANTED**. An appropriate Order follows.

/s/ Gerald Austin McHugh
United States District Judge
